1
2
3
4
5
6
7
8
9   **UNITED STATES DISTRICT COURT**
10   **CENTRAL DISTRICT OF CALIFORNIA**
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| ALICE LEE, et al. | Case No. 2:15-cv-02495-ODW-PLA |
| Plaintiffs, | [Consolidated with 2:15-cv-03464-ODW-PLA] |
| v. | **DECLARATION OF MARGARET A. DALEY** |
| GLOBAL TEL*LINK CORPORATION, | |
| Defendant. | ***REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL*** |

## DECLARATION OF MARGARET A. DALEY

I, Margaret A. Daley, declare:

**SUMMARY OF OPINIONS**

1.     Due to the lack of disposition codes in the calling records at issue, it is impossible to determine which calls were successfully made and received. The calling records therefore cannot be used to identify the class, as to do so would materially misidentify the class members and overcompensate them by counting calls that were never made or were never received.

2.     The calling records at issue reveal that the built in "opt-out" mechanism embedded in the system design successfully opts out the call recipients from hearing multiple call notifications once the call is answered. The limited number of instances where more than one Notification Call is attempted resulting from an inmate's call can be attributed to congestion, inactive phones and other circumstances where the call does not connect. The lack of disposition codes makes it impossible to determine the exact reason for the failure to connect.

3.     The telephone records and other evidence in this case demonstrate that proposed class claimant Attorney David Martin is not a typical class claimant as the number of Notification Calls that were attempted to his publicized business number are significantly higher in volume than the vast majority of proposed class claimants.

4.     Due to the prevalence of unlimited voice plans which do not charge telephone subscribers for each call received, an individualized inquiry is necessary to determine which proposed class claimants sustained any charges for the calls at issue.

5.     The plan to subpoena wireless carriers to identify subscribers and users will result in significant undisclosed costs and delays and will fail to identify a significant number of proposed class members.

6.     The reverse cellular telephone look up methodology proposed by the plaintiff to identify the proposed class will result in a substantial number of misidentified class

members as these lookup services do not contain reliably accurate information regarding the users, owners and subscribers of cellular telephone numbers.

7.    Plaintiff's expert Jeffery Hansen has overstated and misrepresented his professional experience and technical credentials.

## QUALIFICATIONS

8.    I am a Managing Director at Berkeley Research Group ("BRG") and a leader in its Technology Advisory and Global Investigations + Strategic Intelligence practice groups.[1]  BRG is a leading global strategic advisory and expert services firm that provides independent expert testimony, litigation and regulatory support, authoritative studies, strategic advice, and data analytics to major law firms, Fortune 500 corporations, government agencies, and regulatory bodies around the world. I joined BRG in March 2015.

9.    Prior to joining BRG, I was the Co-Chair of the Forensic Technology & Analytics practice for seven years at Duff & Phelps, an international consulting firm. I was also a Vice President and General Counsel at an international investigations firm. I have an undergraduate degree from the University of Michigan. I received my Juris Doctor *cum laude* from Boston University School of Law.

## DATA ANALYTICS AND INVESTIGATIONS EXPERIENCE

10.    I have been an investigations professional since 1997 and am a licensed private detective in the states of Illinois and Michigan. I have performed thousands of due diligence and background investigations on corporations and persons. I am experienced in the use and reliability of data provided by data brokers such as LexisNexis, TransUnion, Experian and others.

11.    I specialize in leading forensic technology investigative teams that work on

---

[1] See Curriculum Vitae of Margaret Daley, attached as Exhibit A.

DECLARATION OF MARGARET A. DALEY

complex databases housing sophisticated financial, transactional, and compliance related data. For example, I led the team that supported Anton Valukas, the Examiner in the Lehman Brothers' bankruptcy and was responsible for extracting data from Lehman Brothers' accounting, compliance and trading database systems. I also led the investigation into false reporting by the University of Illinois College of Law of class profile statistics which involved the analysis of both structured and unstructured data. I have led hundreds of investigations involving the analysis of electronically stored data in both structured relational databases and unstructured data.

12.    I have led investigations into data warehouses storing, among other things, telephone calling data stored by Automatic Telephone Dialing Systems ("ATDS"), banking transactions, brokerage orders, sales and marketing information, employee benefit information, healthcare records, website traffic information, accounting records, educational records, customer loyalty program information and customer account records.

13.    I am an expert in conducting investigations of all sorts, including background investigations, asset searches, fraud, money laundering and inquiries related to the integrity and security of electronically stored data. I have over 25 years of experience in investigations, data analytics, computer forensics, dispute resolution and regulatory compliance. My work has been conducted on behalf of Boards of Directors, regulators, corporate executives and outside counsel. I have been retained by regulators to design reporting and audit systems. I have testified both as an expert and as an investigations fact witness in civil cases, arbitrations, regulatory proceedings, and sanctions hearings.

## **AWARDS**

14.    My investigations team was named "Best of Chicago for Global Risk Investigations" by the National Law Journal in 2012. In 2014, 2015 and 2016, I was named by Who's Who Legal as one of a limited group of nationally recognized Forensic Investigation experts.

DECLARATION OF MARGARET A. DALEY

## **CERTIFICATIONS**

15.    I am a Certified Information Privacy Professional ("CIPP"),[2] a Certified Fraud Examiner ("CFE") and a Certified Anti-Money Laundering Specialist ("CAMS"). I am licensed as an attorney in the State of Illinois, but I do not engage in the practice of law. I am licensed to practice as a private investigator in the states of Illinois and Michigan.

## **BOARDS**

16.    I am currently the Chair of the Cook County Board of Ethics. I was appointed to the Board of Ethics by the President of Cook County and the Cook County Board of Commissioners. The Cook County Board of Ethics is responsible for enforcing the Cook County Ethics Ordinance. The Ethics Ordinance requires all Cook County officials and employees to abide by a Code of Conduct, which sets forth general directives to ensure fair and honest government in Cook County.

17.    I am also a member of the Illinois Private Detective, Private Alarm, Private Security, Fingerprint Broker and Locksmith Board. I was appointed to this board by Jay Stewart, the Director of the Illinois Division of Professional Regulation. The Board has oversight over the policies, procedures, and rules relevant to the administration and enforcement of the Illinois Private Detective, Private Alarm, Private Security, Fingerprint Broker and Locksmith Act, which governs these licensed professions in the State of Illinois.

18.    In 2008-2009, I was asked to serve on the American Institute of Certified Public Accountants ("AICPA") task force on Forensic Technology. In 2012, I was also appointed by the American Bar Association to serve on its task force on Corporate Monitors.

---

[2] The CIPP certification is issued by the International Association of Privacy Professionals ("IAPP"). The CIPP certification is accredited from the American National Standards Institute under the International Organization for Standardization's IS00 standard 17024. https://iapp.org/certify/cipp/

DECLARATION OF MARGARET A. DALEY

## **TESTIMONY**

I have been called upon to testify as an expert in the following matters during the last four years:

- Johnson v. Navient Solutions, Inc., 1:15-cv-0716 (S.D. Ind., 2015)
- Henderson, *et al.* v. United Student Aid Funds Inc., 3:13cv1845 (S.D. Calif., 2013)
- Charvat, *et al.* v. Valente, *et al.*, No. 12-cv-5746 (N.D. Ill., 2012)
- Ameristar Casino East Chicago, LLC. v Unite Here Local 1, No. 45d01-1504-Pl-00034 (Lake Co. Sup. Ct., Indiana, August 2015)
- ABA's Council on Legal Education and Admission to the Bar Data Policy & Collection Committee Meeting (Jan. 2014)
- ABA's Council on Legal Education and Admission to the Bar Sanctions Hearing, University of Illinois College of Law (Jan. 2012)

## **PUBLICATIONS**

19.     I have authored or co-authored the following publications in the last ten years:

- "Life is Short; Affairs Are Expensive: The Ashley Madison Breach and Its Aftermath," *ThinkBRGTech.com* (2015)
- "FCC TCPA Declaratory Rules Draw Objections," *ThinkBRGTech.com* (2015)
- "10 Steps to Protecting Your Trade Secrets from the Malicious Insider," *Inside Counsel* (2014)
- "Investigative Report University of Illinois Anonymous Emails of December 12, 2011," prepared by Jones Day and Duff & Phelps under the direction of the University Ethics Office and the Office of the University Counsel (January 13, 2012)

DECLARATION OF MARGARET A. DALEY

- "Investigative Report University Of Illinois College of Law Class Profile Reporting," prepared by Jones Day and Duff & Phelps under the direction of the Office of University Counsel and the University Ethics Office (Nov. 7, 2011)
- "Computer Forensics," chapter in <u>The Commercial Fraud Manual</u>, American Bankruptcy Institute (2010)
- "Forensic Technology and the CPA Practitioner," AICPA Forensic Task Force White Paper (2010-2012)
- "Laptop Discovery: Investigating Cases from Your Office Computer," *The Environmental Litigator*, (Spring, 2010)
- "Weathering the Storm: Timely, Complete and Cost Effective Discovery," *Duff & Phelps White Paper* (Jan. 2009)
- "Fact Finding in the Digital Age," chapter in <u>Product Liability Litigation: Current Law, Strategies and Best Practices</u>, Practicing Law Institute (2009-2015)
- "Avoiding the Disclosure of Intermingled Data," 22nd Annual American Bar Association National Institute on White Collar Crime (2008)
- "Integrating E-Discovery and Investigations Expertise," Metropolitan Corporate Counsel, (Aug. 2008)

## **RETENTION AND COMPENSATION**

20.     I have been retained by counsel for defendant Global Tel*Link. I am being compensated at an hourly rate of $575.

21.     My understanding of the factual matters at issue in the litigation is based on my review of the pleadings, written discovery responses, deposition testimony, and document productions. I understand that discovery is ongoing and that additional information relevant to my opinions may be disclosed in additional document productions and depositions. Accordingly, I reserve the right to amend my findings based upon such

DECLARATION OF MARGARET A. DALEY

additional disclosures.

**DOCUMENTS REVIEWED**

22.    An inventory of the documents reviewed in preparation of this declaration are set forth as Exhibit B.

**FACTUAL BACKGROUND**

23.    Defendant Global Tel*Link Corporation ("GTL") is a provider of telecommunications technologies and related services to correctional facilities across North America.[3]  The rules applicable to inmate calling activity vary according to each correctional system. Typically prisoners are not permitted to receive incoming calls, may only use the phones at authorized times, and may only place collect calls.[4]   These limitations present special problems for inmates' ability to communicate with the outside world, because more than 40% of U.S. households are exclusively dependent on cellular telephones[5], and with few exceptions cell phone service providers do not allow collect call billing.[6]  In addition, some local exchange carriers (providers of landline phone service) also prohibit collect call billing.[7]

24.    In order to connect inmates with people that cannot receive collect calls, GTL serves as an intermediary, to establish a billing relationship with the called party. GTL offers several such billing services, including an "Advance Pay" account into which the

---

[3] See Global Tel*Link Corporation's website at http://www.gtl.net/about-us/

[4] See Nicholas H. Weil, "Dialing While Incarcerated: Calling For Uniformity Among Prison Telephone Regulations," *Washington University Journal of Law and Policy* (2005), attached as Exhibit C.

[5] GfK MRI's Survey of the American Consumer Press Release, "44% of US Adults Live in Households with Cell Phones But No Landlines" (Feb. 4, 2015), attached as Exhibit D.

[6] http://www.gtl.net/in-telephone-service/

[7] Deposition of Edward Olsen at 176:22-23.

DECLARATION OF MARGARET A. DALEY

called party can prepay funds.[8]  Subsequent calls placed by an inmate to that individual would then be charged by drawing down funds from the Advance Pay account.[9]

25.     When an inmate at a correctional facility served by GTL places a call to any contact, and that call is answered, then GTL's systems place the inmate on hold while a pre-recorded message is played to the call recipient. The pre-recorded message offers the call recipient three options:

1)     Block the caller's number, which will prevent any future calls from that number;

2)     Reject the call, which terminates the call but does not affect future calls; or

3)     Accept the call.[10]

If the call recipient accepts the call, GTL will bill the charges as appropriate. If the recipient does not have an existing account by which to pay those charges, GTL can connect the recipient to a 1-800 service to establish and fund that account.[11]

26.     If the recipient does not establish and fund an account at that time, or if the inmate's original outbound call from the correctional facility did not connect at all, then GTL will initiate a notification call to the intended call recipient ("Notification Call"). The Notification Call contains a pre-recorded interactive voice recording ("the IVR message")

---

[8] Options also include "Direct Remit" or postpaid billing, pre-payment of a single call, inmate debit accounts, prepaid phone cards. In addition, GTL also brokers collect call billing for call recipients for whom that is an option.  Deposition of Edward Olsen at 14:1-16:19, and 103:3-104:16.

[9] Id. at 13:15-19.

[10] Id. at 52:15-53:15.

[11] Global Tel*Link Petition for Expedited Clarification and Declaratory Ruling, pp. 4-5; also Deposition of Edward Olsen at 51:2-9.

DECLARATION OF MARGARET A. DALEY

informing the recipient that an inmate has attempted to contact them.[12]

27.    The Notification Call will be attempted up to three times, spaced at approximately 11-hour intervals over a 32-hour period, as needed to deliver the IVR message to the intended call recipient.[13]  Once the Notification Call is connected either to a person or an answering machine, the Notification Calls will cease. It is not necessary for the IVR message to be played in full nor is the call recipient required to take any action, such as "Press 1," in order to opt out of future Notification Calls resulting from the inmate's call. If after three attempts the IVR message has not been delivered, the Notification Calls cease.[14]

28.    GTL treats all outgoing calls from supported correctional facilities as unique events. If a new call is placed to a call recipient who needs to establish an account in order to receive an inmate's collect call, this will trigger an additional Notification Call to that party.[15]  If the call recipient has blocked incoming calls from that correctional facility, no Notification Calls can be sent.[16]

29.    Since approximately 2012, GTL has outsourced the Notification Calls to a vendor named "inContact."[17]  inContact used a calling platform called "Pro Platform" to place the Notification Calls until June 30, 2015. From June 30, 2015 onward, Notification Calls were placed using a platform named "Next Generation."[18]

30.    Between July 30, 2014 and November 1, 2015, an inmate at San Quentin Prison repeatedly attempted to dial the telephone number (510) 332-3943.[19]  This cellular telephone number is published online in multiple locations as the business contact number

---

[12] Global Tel*Link Petition for Expedited Clarification and Declaratory Ruling, p. 5.

[13] Deposition of Edward Olsen at 201:1-16.

[14] Global Tel*Link Petition for Expedited Clarification and Declaratory Ruling, p. 6.

[15] Deposition of Edward Olsen at 59:21-60:08.

[16] Id. at 61:12-25.

[17] Declaration of Edward Olsen, p. 1 ¶ 2.

[18] Id., p. 2 ¶ 3.

[19] Call Detail Reports, produced as Exhibit 11 to the Deposition of Edward Olsen.

DECLARATION OF MARGARET A. DALEY

for Bay-area attorney David W. Martin ("Mr. Martin").[20]  Mr. Martin testified that the inmate, Sean Erwood, is a client of his from a personal injury suit, who was incarcerated for an unspecified reason.[21]  As a consequence of Mr. Erwood's attempts to contact Mr. Martin, inContact attempted sixteen Notification Calls to (510) 332-3943. The call attempts by the inmate are not the subject of this suit[22], but Plaintiff has enumerated all sixteen of the Notification attempts in his motion papers as if each attempt represents a successful call to Mr. Martin's phone. Plaintiff's own billing records from T-Mobile show that of these sixteen attempts, only eight actually connected to his phone.[23]  The available records regarding the Notification Calls do not include disposition codes and therefore do not provide any documentation of which calls were not connected due to technical errors such as busy lines or congestion, and which were answered by a person or answering machine. As set forth more fully below, a substantial number of calls attempted by the inContact platform are never successfully connected.

31.    Plaintiff contends that the Notification Calls placed to the cellular telephone number he advertises as his business line violate the Telephone Consumer Protection Act ("TCPA") and has moved to certify a class of persons alleged to be similar in circumstance to himself:

> All persons residing in the United States (2) who was either the subscriber or primary user of a cellular telephone number (3) to which GTL placed the following prerecorded telephone call (4) between July 1, 2012 and December 25, 2014:
>
> "This is an important message from GTL about calls from an offender at a correctional facility. Para escuchar este mensaje en espanol, oprima el numero

---

[20] http://bayconsumerlaw.com/attorney_david_w_martin/, http://members.calbar.ca.gov/fal/Member/Detail/248636

[21] Deposition of David Martin at 88:2-24 and 91:1-25.

[22] Id. at 78:7-8.

[23] See T-Mobile billing records included as Exhibits 42 and 50 to the Deposition of David Martin, attached as Exhibit E.

DECLARATION OF MARGARET A. DALEY

uno. Your telephone service provider is unable to bill you for these calls. If you wish to receive these calls, you must contact us at 1- 877-650-4249 to arrange for billing. To hear these instructions again, press 1. To end this call, please hang up."[24]

32.      Plaintiff's expert Jeffrey Hansen ("Mr. Hansen") submitted an expert report, dated July 5, 2016 and included as Exhibit 2 to the Motion for Class Certification ("Hansen's Report"). In Hansen's Report, he claims that his analysis identified a proposed class of 961,560[25] unique cellular telephone numbers that met the revised class definition.

**OPINIONS**

<u>**PLAINTIFF'S CLASS DEFINITION INCLUDES PERSONS WHO WERE SUCCESSFULLY OPTED OUT BY GTL'S AUTOMATIC OPT OUT PROCESS**</u>

33.      As detailed above there are two distinct types of telephone calls involved in GTL's administration of inmate calls. The first type are outbound calls placed from correctional facilities by inmates to contacts of their choice. The second type of calls are the Notification Calls placed by GTL's vendor inContact. The diagram below illustrates the relationship between these two distinct systems, and the circumstances under which an inmate's call will result in a Notification Call. Plaintiff does not contend that calls dialed by prisoners (represented in the upper half of the diagram) violate the TCPA. Plaintiff's complaint only concerns the IVR Notification Calls administered by GTL's contractor inContact (represented in the lower half of the diagram).

---

[24] Notice of Motion and Motion for Class Certification, p. 5.  The class definition set forth in the Complaint is materially different.  Plaintiff contends that because the revised class definition is narrower, it is allowable even though the deadline to amend the complaint has passed.  The determination of whether the revised class definition is permissible is beyond the scope of my expertise and I offer no opinion on that question.

[25] As of the date of this report we are unable to exactly replicate Mr. Hansen's results by following the methodology described in his deposition.

DECLARATION OF MARGARET A. DALEY



*Global Tel\*Link and inContact Communications Systems for Inmate Calls and Notifications*

34.   An IVR Notification Call will only be placed under certain specific circumstances. If the call recipient can receive a collect call, has an account already, or establishes one at the time of the inmate's call, no Notification Call will be sent. A Notification Call will be attempted only if an inmate attempts to reach a party that does not have an account in place in order to receive the call.[26]

35.   If the first attempted Notification Call is answered by a human or an

---

[26] Deposition of Edward Olsen at 53:22-25; 54:1-2.

DECLARATION OF MARGARET A. DALEY

answering machine, then no further Notification Calls are placed. If that first Notification Call attempt fails to connect then a second attempt will be made. If the second attempt also fails to connect, then a third, and final, attempt will be made.[27]  In other words, the mere receipt of a Notification Call is itself an "opt-out" mechanism, because answering the phone *immediately* causes the system to cease placing Notification Calls. Unlike interactive opt outs which require call recipients to listen to the entire IVR message and to then take some kind of action such as "Press 1" to opt out, this system **automatically** opts out all call recipients from any future calls arising out the inmate's call.

36.    Analysis of the call data produced in this case shows that the majority of the plaintiff's proposed class is comprised of individuals to whom only one Notification Call was even attempted. These individuals were successfully opted-out on the very first call, and never received any further Notification Calls at all. Set forth below is an explanation of the analysis underlying this observation.

37.    Defendant GTL produced a set of 37 spreadsheets in comma-separated-values (csv) format representing call records from inContact's Pro Platform system from July 2012 through July 2015.[28]  Mr. Hansen's analysis, and his conclusion that the proposed class consists of 961,560 unique cellular telephone numbers, was derived from these csv files.[29]  At my direction, these 37 csv files were imported into a SQL Server environment for analysis.[30]

---

[27] Id. at 42:2-9.

[28] Hansen's Report mistakenly reports only 36 csv files were produced, but he correctly states the date range.  (p. 7)

[29] Hansen's Report pp. 7-10.

[30] Additionally, the IMS Wireless Block Identifier file and the Neustar Ported Number Lists (wireless-to-landline and landline-to-wireless) were imported to the same SQL Server environment.  Prior to uploading the data to SQL Server, each .csv file was opened in a text editor (Text Pad) to view the contents.  As a Quality Control measure, each imported file was compared to the raw text to verify that all rows and columns were imported.  During this verification stage it was observed that the column headings produced to us included column headers for disposition codes (Disp_Code, Disp_Name, and Disp_Comments) but none of the rows in the csv files actually contained any data for these columns. The significance of this is discussed more fully later in this report.

DECLARATION OF MARGARET A. DALEY

38.     These data sets were queried to identify all call attempts between July 1, 2012 and December 25, 2014 to a number that was assigned as a cellular telephone number at the time of the call, and which was identified in the InContact data with Skill Number 167910 and Skill Name GTL2. This process was designed to replicate the process described by Mr. Hansen in his deposition.[31]  We were unable to completely replicate his results so we are relying upon the numbers provided by him for the purpose of the analysis set forth herein. For the sake of discussion only, I will refer to this resulting data set as the Plaintiff's Proposed Class. For reasons discussed below, however, I do not agree with Mr. Hansen that this data set is appropriate to use to identify potential class claimants.

39.     The call attempts represented in Plaintiff's Proposed Class were queried to identify the number of Notification Calls with Skill Number 167910 and Skill Name GTL2 that were attempted to each unique cellular telephone number. For 54.53% of the telephone numbers *only one Notification Call* was attempted.[32]

40.     GTL received a declaratory ruling from the FCC exempting their Notification Calls from the TCPA under certain conditions, including that the call contain an opt-out mechanism.[33]  Plaintiff and defendant disagree on the form that the opt-out mechanism must take, but the data shows that over half of the call recipients that plaintiff contends have an actionable claim under the TCPA *received exactly as many calls as they would have, had plaintiff's preferred opt-out mechanism been employed*. Furthermore, under the plaintiff's preferred method, the call recipients would have had to listen to the entire recording plus take action such as a "press 1" to opt out. Under such a scenario, persons receiving a Notification Call who hang up upon hearing the recording play would continue to receive Notification Calls. The majority of Plaintiff's Proposed Class were opted out automatically by GTL *on the very first call*.

---

[31] Deposition of Jeffrey Hansen at 214:8-220:17.

[32] <u>See</u> Proposed Class List Volume Dispersion Results, attached as Exhibit F.

[33] FCC 15-72 pp. 7987-7989, ¶ 43-45.

DECLARATION OF MARGARET A. DALEY

## <u>PLAINTIFF DAVID MARTIN IS NOT A TYPICAL REPRESENTATIVE OF THE CLASS HE PROPOSES</u>

41.     In several key respects, the circumstances of plaintiff David Martin present unique facts and issues distinct from the rest of the class he proposes to represent.

42.     The only reason Mr. Martin's identity is known is because he stepped forward to identify himself. Plaintiff has proposed the use of wireless carriers' billing records and providers of subscription database information to identify the individuals associated with each telephone number listed in Plaintiff's Proposed Class. Below I detail numerous deficiencies and errors associated with this proposed methodology, but in the case of Mr. Martin there is an additional specific issue. As a resident of California, Mr. Martin's personally identifying information is governed by California's strict data privacy laws. Courts have held that the wireless carriers may not legally divulge his identity unless he has affirmatively authorized them to do so.[34]   Because he volunteered his identity, Mr. Martin is therefore capable of being included in the Proposed Class, whereas his fellow Californians will not be afforded the same opportunity.

43.     According to the records used by Mr. Hansen to identify the proposed class, inContact attempted to place sixteen Notification Calls to Mr. Martin's number. This number of Notification Call attempts is not typical of the population of telephone numbers in Plaintiff's Proposed Class, and in fact identifies Mr. Martin as an outlier. The average number of Notification Call attempts is only three. 97% of the Plaintiff's Proposed Class involved fewer attempted Notification Calls than Mr. Martin.  Less than .27 percent of the proposed class members have as many attempted Notification Calls as Mr. Martin. This would suggest that his individual claim for relief, if found valid by the Court, would significantly exceed the average claim for the class as a whole.

---

[34] See <u>Birchmeier et al</u> v. <u>Caribbean Cruise Line, Inc. et al</u>, 1:12cv04069 (N.D. Ill., filed May 24, 2012), ECF 302; and <u>Sherman v. Yahoo! Inc</u>., 3:13cv0041 (S.D. Calif., filed Jan. 8, 2013), ECF 191.

DECLARATION OF MARGARET A. DALEY

## INDIVIDUALIZED INQUIRY IS NECESSARY TO DETERMINE WHICH CALLS WERE RECEIVED

44.     The reasons for failing to connect to either a live recipient or voicemail service include call *placement* problems and call *receipt* problems. An example of a call placement problem is a "trunk error," which occurs when an outbound call cannot even be placed because no dial tone is present. An example of a call receipt problem is a disconnected telephone, which cannot receive incoming calls. Cellular numbers are often disconnected for a number of reasons. For example, many cellular phone owners use prepaid account services.[35]  When those accounts are in arrears the cellular service provider will disconnect the service until money is placed into the account. Mr. Hansen stated in his deposition that when a call is placed to a number that is out of service,  no recording is played by a dialer system:

> If it reaches a number that's out of service, the system will recognize a number that's out of service or ultimately that it wasn't answered or answering machine detect and no message would be played.[36]

45.     Demographic studies make clear that most inmates in American prisons have pre-incarceration incomes near the federal poverty line. For example, one study found that in 2014 dollars, incarcerated people had a median annual income of $19,185 prior to their incarceration.[37] The federal poverty line for a two person household in 2014 was $15,730 and $11,670 for one person households.[38]

46.     Given the high level of financial distress amongst the prison population, it is likely that many of the friends and family members called by those inmates may have

---

[35] According to the 2012 North American Wireless Survey, as of June 30, 2012, the percentage of prepaid subscribers was 17% for wireless carriers with revenue over $5 billion, and 50% for wireless carriers with revenue under $5 billion.  See Exhibit G, p. 66.

[36] Deposition of Jeffrey Hansen at 185:5-9.

[37] In fact, incarcerated people in all gender, race, and ethnicity groups earned substantially less prior to their incarceration than their non-incarcerated counterparts of similar ages.  See http://www.prisonpolicy.org/reports/income.html,

[38] http://obamacarefacts.com/federal-poverty-level/

DECLARATION OF MARGARET A. DALEY

trouble paying cellular bills and may experience service interruptions. A 2015 study by the Pew Research Center found that 23% of smartphone owners have cancelled or suspended their service at some point due to financial constraints. For those smartphone owners with annual incomes below $30,000, the number of users whose service was discontinued at some point jumps to almost half.[39]

47.     Plaintiff's expert Jeffrey Hansen agrees that impoverished persons are more likely to use prepaid plans due to their inability to obtain credit:

> Q     Do you have any idea what percentage of persons out there use prepaid, or example, TracFone?
>
> A     I'm going to say depending on the demographics that you're calling, it is going to vary.
>
> Q.     Okay. And how does that rough out in your mind depending on the demographics?
>
> A     It depends on the demographics. If you call, for example, a debt collection list, that percentage of prepaid phones is going to be very high, because you're dealing with people that overall that list they don't qualify for credit or if you're calling a retirement community or an area that is, you know, a retirement area you might be dealing with a lot more prepaid phones there because, well, those phones may not be being used enough for them to justify a 60, $70 phone bill a month.[40]

48.     When a telephone line is either temporarily or permanently out of service it means that no calls can be received by the subscriber or user. Many of the Notification Call attempts were likely never received due to these service interruptions. The lack of disposition codes in the call data means that it is impossible to determine from the records

---

[39] <u>See</u> Pew Research Center's April 1, 2015 report on U.S. Smartphone Use in 2015, accessed at http://www.pewinternet.org/2015/04/01/chapter-one-a-portrait-of-smartphone-ownership/, attached as Exhibit H.

[40] Deposition of Jeffrey Hansen at 232:19-233:12.

DECLARATION OF MARGARET A. DALEY

which calls were even placed, and which calls were actually received.

49.    A "disposition" is a coded description automatically populated by ***some*** dialer systems to their call records to document the outcome of an attempted call. Not all attempted calls are successfully placed, and of those that are, not all are successfully received. Disposition codes describe the outcome of an attempted call so that the user can determine which calls were answered live, which were answered by voicemail, which calls could not be placed due to congestion or system failures and so on. Examples of typical disposition codes used in the dialer industry include "ANSWERED" for a call answered by a human, "MACHINE" for a call answered by an answering machine or voice mail system, "BUSY" for a call that did not connect because the line was occupied, and "TRUNK ERROR" for a call that was dialed but never placed due to a system failure on the part of the calling party.[41]

50.    The records collected and produced by inContact did not use disposition codes during the relevant period.[42]  Plaintiff's own expert Mr. Hansen testified that because the disposition codes were missing from the call records, the data was "incomplete" and could not be used to determine which if any calls actually connected.[43]  In fact, at his deposition, Mr. Hansen stated that from the limited information available on the Pro Platform records, he was unsure that *any* of the calls connected: "[A]s it is right now, the very limited records, because we only have a handful of calls here, ***it appears that I have a list of calls that were***

---

[41] Charvat v. Travel Services, 1:12cv05746 (N.D. Ill., filed July 23, 2012), Deposition of Jeffrey Hansen at 135:16-136:1:

> Q. For the record, can you just explain what a disposition code is?
>
> A. That would be the -- how to call a disposition, such as a human answer, answering machine, no answer, disconnect, hung up, trunk error. Those are the standard codes. And those are intended to be not just some one guy's organizational methods, particularly with these dialers, they use standard ones. Because it is a telemarketer that's actually dealing with the names of the disposition codes.

[42] This is confirmed by observation of the call records produced from inContact.  In each of the 37 csv files, the fields relating to disposition codes are not only empty, but the data row actually ends before that column is reached.

[43] Deposition of Jeffrey Hansen at 195:1, 195:9-12, 198:22-199:1, and 201:23-24.

DECLARATION OF MARGARET A. DALEY

_**not completed**_." (Emphasis added)[44]

51.   Mr. Hansen also testified that disposition codes are necessary to identify situations such as trunk errors, in which a call cannot be placed but is still logged in the call records.[45]   As Mr. Hansen noted, the call records _will still log the call attempt_ even though no dial tone was present and no call was dialed, much less connected.[46]   The inContact records contain an unknown number of such errors, in which the records identify calls that never even occurred.

52.   Documents produced by plaintiff Mr. Martin illustrate the problem. For example, the inContact records show that three Notification Calls were attempted to Mr. Martin's number (510) 332-3943 on July 31, 2014.[47]   Meanwhile the telephone bills Mr. Martin produced for the time period covering July 31, 2014 only show _two_ calls from inContact on that date.[48]   A comparison of the inContact records to the T-Mobile bills produced by Mr. Martin, which he testified at his deposition document _all_ of the calls made by GTL or inContact to him,[49] shows that out of sixteen Notification Call attempts recorded by inContact, only eight (50%) actually connected to his phone.[50]

53.   Mr. Hansen relied on the inContact data to identify the proposed class claimants, but in doing so he included _twice as many_ calls to Mr. Martin as the plaintiff's own testimony and document production establish actually connected. The inContact records, because they lack disposition codes, cannot be used to reliably show which calls were completed. The only way to accurately document which calls were actually _connected_ is by individually comparing each proposed class claimant's telephone billing records for

---

[44] Id. at 199:6-9.

[45] Id. at 260:10-262:14

[46] Id. at 190:22-192:1.

[47] See Call Record Extract included as Exhibit 15 to the Deposition of Edward Olsen, attached as Exhibit I.

[48] See Exhibit E.

[49] Deposition of David Martin at 78:23-79:10, 82:8-20, and 86:22-87:20.

[50] See Exhibits E and I.

DECLARATION OF MARGARET A. DALEY

the entire time frame of the proposed class with each of the calls attempted to that person's number that was recorded on the csv files for the relevant time period.

54.    In July 2015, inContact switched over to using an alternate platform called Next Generation.[51]   This system *did* record disposition codes for Notification Calls.[52] Examining these later records, for calls outside the time period of the class definition, is illuminating. The data from the newer platform shows that 30% of the attempted Notification Calls never connected with a recipient, for a variety of reasons. This analysis is purely for illustration, and cannot be mapped directly onto the call records of the Plaintiff's Proposed Class. However, these figures demonstrate the importance of applying disposition codes to determine which calls completed. Because this data is lacking for the records that cover the time frame of the proposed class, it is not possible to automatically filter out calls that did not complete. As a consequence, relying on the inContact call detail records to identify potential class claimants will result in the improper inclusion of calls that never connected because the line was busy, the recipient's phone number had been disconnected, which rang through without being answered, or failed for other reasons.

| Disposition | Percentage of Total | Status |
|---|---|---|
| Blank | 17.46% | Not connected |
| Busy | 0.19% | Not connected |
| Disconnect | 0.21% | Not connected |
| Error | 0.09% | Not connected |

[51] Declaration of Edward Olsen In Support Of Defendant Global Tel*Link Corporation's Opposition To Plaintiffs' Motion To Compel, p.1 ¶ 3.

[52] The dispositions tabulated in the chart below were recorded in the records from inContact's Next Generation platform.  A complete chart of disposition codes currently tracked by inContact is set forth at https://help.incontact.com/current/Content/Central/Dispositions/SystemDispositionValues.htm.  Mr. Olsen also testified regarding the meaning of disposition codes at 144:18-146:8.

| | | |
|---|---|---|
| Fax | 0.14% | Not connected |
| Invalid Number | 0.85% | Not connected |
| ISDN Cause Code 102 (Recovery on timer expiry) | 0.06% | Not connected |
| ISDN Cause Code 18 (No user responding) | 0.14% | Not connected |
| ISDN Cause Code 21 (Call rejected) | 0.01% | Not connected |
| Network Busy | 0.04% | Not connected |
| No Answer | 13.65% | Not connected |
| No Scripting Disposition | 0.00% | Not connected |
| None | 0.04% | Not connected |
| Number Changed | 0.00% | Not connected |
| Answered - Short Call | 20.68% | Connected |
| Answered Call | 14.21% | Connected |
| Answering Machine | 0.00% | Connected |
| Called Party Hang Up | 3.12% | Connected |
| Machine - Hung Up | 3.08% | Connected |
| Machine - Message Left | 26.06% | Connected |

55.    In order to account for this problem, it will be necessary to conduct an individualized analysis of each purported class member's cellular service records.

**INDIVIDUALIZED INQUIRY IS NECESSARY TO DETERMINE WHICH PROPOSED CLASS CLAIMANTS WERE IN FACT CHARGED BY THEIR WIRELESS CARRIERS FOR NOTIFICATION CALLS**

56.    According to the First Consolidated Class Action Complaint, plaintiff asserts that he and all putative class members "suffered damages by being charged by their cell phone carriers for the minutes, time, or usage for the calls made by Defendant."[53]

---

[53] First Consolidated Class Action Complaint, p. 8 ¶ 52.

DECLARATION OF MARGARET A. DALEY

57.     Plaintiff asserts that this is uniformly true of all proposed class members, without having undertaken any analysis to determine which class members indeed were charged and which were on unlimited-minutes plans from their wireless carriers, and therefore were not charged.

58.     Analysis of wireless industry trends found that as of 2012, the start of the time period covered by the class definition, wireless providers were increasingly promoting the use of family plans and unlimited-minute calling plans as a means of enticing consumers in a competitive marketplace.[54]  The 2012 North American Wireless Industry Survey by PriceWaterhouseCooper reported that 56% of prepaid wireless customers subscribed to unlimited voice plans, for which they paid a flat fee regardless of the number of calls made or received.[55]

59.     Documents produced in the instant matter show that *Mr. Martin himself was on an unlimited minutes plan from his wireless carrier T-Mobile*.[56]  The billing records produced by Mr. Martin demonstrate that in fact he *was not charged* by T-Mobile for any of the Notification Calls. However, Mr. Martin testified that he believed he did incur charges related to the Notification Calls when he accessed his voicemail during foreign travel, but that these charges cannot be identified directly by examining his T-Mobile bills.[57]  Mr. Martin has produced no records documenting this alleged charge nor has he produced any evidence that the members of the purported class were international travelers who incurred such charges. The call detail records produced by GTL and inContact in this matter do not contain any information about the billing arrangements any of the call recipients have with their respective wireless providers. Due to the high number of participants in unlimited-calling plans generally across the American population, it is likely

---

[54] See Federal Communications Commission Seventeenth Report (December 18, 2014) Publication DA 14-1862, attached as Exhibit J; *see also* Exhibit G.

[55] Exhibit G.

[56] Deposition of David Martin at 66:4-24 and 68:24-69:7.  See also Exhibit E.

[57] Deposition of David Martin at 165:19-166:6.

DECLARATION OF MARGARET A. DALEY

a high number of proposed class claimants were not charged by their wireless carriers to receive Notification Calls, and therefore cannot claim the alleged "damages" cited by plaintiff in the complaint. If Mr. Martin's experience is not unique to him, then some, but not all, of the proposed class claimants on unlimited-calling plans will also have been charged to access their voice mail while traveling abroad. According to Mr. Martin's own testimony, however, this condition is not evident from the wireless billing records but can only be identified by the affected party themselves.[58]  In order to identify which potential class claimants were charged to receive Notification Calls, it is therefore necessary *first* to conduct an individualized inquiry into each potential class claimants' wireless plan, and then *second* conduct inquiries of each potential class claimant with unlimited minutes to determine if they too were charged to access their voicemail during foreign travel, and if so, when and how often.

## INDIVIDUALIZED INQUIRY IS NECESSARY TO DETERMINE THE IDENTITY OF POTENTIAL CLASS CLAIMANTS

60.    Plaintiff's intended class is apparently meant to encompass all of the individuals who received a specific Notification Call. However, plaintiff's proposed methodology fails to do so. Plaintiff proposes to subpoena cellular carriers in order to obtain the identity of the subscribers and users and to use database "reverse lookup" services to identify the historical subscribers and users of those numbers. Neither of these proposals are workable, and they will result in an inaccurate class list.

### *Plaintiff's Proposal to Subpoena Records From Wireless Carriers Involves Substantial Barriers and Undisclosed Costs*

61.    Plaintiff proposes to identify class claimants by sending subpoenas to the top cellular telephone carriers to obtain the names and addresses of the proposed class

---

[58] Id. at 168:22-169:2.

DECLARATION OF MARGARET A. DALEY

members.[59]

62.    According to Mr. Hansen there are 961,560 telephone numbers at issue. Mr. Hansen also stated in his deposition that there are approximately 150,000 telephone carriers and plaintiff only intends upon propounding subpoenas to those that are most commonly used. Therefore some persons who received the calls at issue will be excluded from the class only because they chose to use a less popular cellular service. The "margin of error" for this process is unknown to Mr. Hansen but he guesses it could be as high as ten percent:

> Mr. Hansen: This analysis is going to identify the most common carriers. There are approximately 150,000 phone carriers. Naturally we don't want to subpoena every one of them. So this process really isn't necessarily designed to identify every phone number without a margin of error. And for our purposes, the margin of error of 2, 3, 5, 10 percent even, which I really don't believe it would go that high, it doesn't really matter for our purposes because our purpose is to identify the bulk of the carriers we could identify which carriers we would want to send the list off to have them fill in the blanks as to the subscriber info. Once the carrier has the list, they will be able to identify which area codes and prefixes or actually which phone numbers entirely belong to them and which ones don't. That would cover that ported from wireless to wireless provider issue.
>
> Q    What about the rest of the people?
>
> A    I don't know if there is anyone left.[60]

63.    Contrary to the impression given by Mr. Hansen who assumes the carriers will simply "fill in the blanks," the subpoena process proposed is not so simple. Telecommunications carriers do not simply turn over the personal, private billing data of their subscribers without objection, nor are they willing to perform such an undertaking for

---

[59] Plaintiff David Martin's Notice of Motion and Motion for Class Certification, p. 13.

[60] Deposition of Jeffrey Hansen at 231:16-232:10

1  free. This fact should be well known to plaintiff's counsel, based on the prior experience

2  of Timothy Sostrin.

3      64.    In the Declaration of Timothy J. Sostrin in Support of Motion For Class

4  Certification, Mr. Sostrin states that he successfully "subpoenaed Sprint to obtain the

5  names and addresses of persons subscribing to [the relevant] telephone numbers at the time

6  of the calls and Sprint provided names and addresses for the persons subscribing to the

7  numbers that were serviced by Sprint."[61]  Mr. Sostrin identifies this case in question as

8  <u>Johnson v. Yahoo!</u>, 2016 U.S. Dist. LEXIS 256 (N.D. Ill. 2016).

9      65.    In fact, Sprint's reply to Mr. Sostrin's subpoena states that "Sprint is only able

10  to produce records for California target numbers upon receipt of a Judge's court order or

11  notarized, account holder consent."[62]  From the documents Mr. Sostrin appended to his

12  Declaration, it is clear that Sprint ultimately complied with the subpoena only after ten

13  months of motion practice, and it is unclear from public records what was contained in

14  Sprint's eventual production and to what extent that data identified subscribers and/or

15  users.[63]

16      66.    Although Mr. Sostrin's Declaration claims that he "also subpoenaed T-

17  Mobile to obtain the names and addresses of persons subscribing to T-Mobile telephone

18  numbers at the time of the calls," this statement glosses over the fact that T-Mobile objected

19  to producing any documents. In fact, Mr. Sostrin amended his request to propose merely

20  that T-Mobile produce an affidavit stating that it held the records and could produce them

21  at a later time if necessary. T-Mobile again objected. Mr. Sostrin filed a Motion to Compel,

22  and on June 24, 2015, the court ruled that T-Mobile only had to produce an affidavit

23

24  [61] Declaration of Timothy J. Sostrin in Support of Motion For Class Certification, included with Plaintiff

25  David Martin's Notice of Motion and Motion for Class Certification as Document 72-9, pp. 2-3 ¶ 13,
   attached as Exhibit K.

26  [62] <u>See</u> Exhibit K.

27  [63] Sprint's reply of February 9, 2016 reads "Please find enclosed, the subscription results from the State

28  of California." Sprint's original reply, in which they state that a "Judge's court order or notarized,
   account holder consent" is required, was dated April 13, 2015.  <u>See</u> Exhibit K.

DECLARATION OF MARGARET A. DALEY

*describing what records it held*. T-Mobile never produced the names and addresses Mr. Sostrin sought.[64]

67.    Johnson v. Yahoo!, the case cited by Mr. Sostrin as an example of successful use of subpoenas to wireless carriers, had a "sister" case which involved many of the same issues, but with respect to different wireless carriers. In Sherman v. Yahoo!, the United States District Court for the Southern District of California denied class certification, noting:

> Plaintiff's last resort is to issue a subpoena to AT&T for subscriber records. As an initial matter, Plaintiff has not demonstrated that she has any likelihood of success via this route. In several other cases, cellular carriers have refused to turn over similar records pertaining to California customers in TCPA cases based on the right to privacy established by California Public Utilities Code section 2891(a)(4)10 and Plaintiff offers no explanation as to why AT&T will turn over subscriber records here.[65]

68.    Wireless carriers may also charge fees for producing subscriber data in civil litigation. When requests to return data associated with tens of thousands or even hundreds of thousands of wireless numbers, these fees can quickly become quite substantial, as set forth more fully below. The chart below sets forth the estimated charges identified for the top five wireless carriers.[66]

---

[64] Johnson v. Yahoo! Inc., 1:14cv02028 (N.D. Ill., filed Mar. 21, 2014), ECF 115 and 116, attached as Exhibit L.

[65] Sherman v. Yahoo! Inc., 3:13cv0041 (S.D. Calif., filed Jan. 8, 2013), ECF 191.

[66] Copies of the respective subpoena policies are set forth as Exhibit M.

27

DECLARATION OF MARGARET A. DALEY

| CARRIER | REVERSE LOOKUP CHARGE | DATES AVAILABLE | ADDITIONAL CHARGES |
|---------|----------------------|-----------------|---------------------|
| Verizon | $40 per record | No date restriction identified | $75 an hour plus overtime if necessary. Estimated fee to be collected in advance. $0.25 cents per copy |
| AT&T | $35 per initial request; $10 per month per number searched | No date restriction identified | AT&T charges $10 for each month searched[67] |
| Sprint | $50 per number | Last 90 days only | |
| T-Mobile | $50 for first number, $10 per each additional number | 6 years from account closure | Additional charges may be levied for "unusually burdensome requests" involving large volumes of subscriber records and/or large time frames. These charges may include $25 per number, and additional fees depending on the request |
| US Cellular | $5 per number | Last 7 years only | Additional charges may be levied for services such as retrieving call detail records ($50 per subscriber per month) |

---

[67] AT&T Legal Compliance Analyst "Laurette" quoted these rates via telephone conversation on April 26, 2016 but stated the company would not put this in writing and prefers to estimate total fees only after evaluating the specific scope of a given request.

DECLARATION OF MARGARET A. DALEY

69.     In his report, Mr. Hansen described a process by which he proposed to identify which wireless carriers to subpoena for records. He stated that he would correlate the Central Office Code Assignments published by the North American Numbering Plan Administration with the Pro Platform records to identify which wireless provider had been assigned any given cellular telephone number.[68]  According to his deposition testimony, although this process could only identify the *original* assignee of any given number, he estimated that the instances of consumers changing wireless carriers would be so few as to be a "small percentage" within an acceptable margin of error:

> Again, there's a small percentage of people -- there's a small percentage of people that would port between one number or one carrier and another carrier and keeping it as a wireless number and keeping their existing phone number. There's a small percentage. It doesn't account for the small percentage. So that's why I say there is a margin of error. And that margin of error is very small.[69]

70.     Contrary to Mr. Hansen's statement, an analysis conducted on behalf of Neustar, the contractor that administers the NPAC database, reported that in 2012, only 77% of survey respondents still had the same wireless service provider as they had three years previously.[70]

71.     Plaintiff David Martin testified that he himself had changed wireless carriers on several occasions, from T-Mobile to Verizon, and back to T-Mobile.[71]  Mr. Martin also testified that he had previously changed carriers from Sprint.[72]

72.     At my direction, the Plaintiff's Proposed Class was compared to the Central Office Code Assignments published by the North American Numbering Plan

---

[68] Hansen Report, p. 9-10.

[69] Deposition of Jeffrey Hansen at 229:4-12.

[70] *See* "Telephone Numbers Are Portable; Is the NPAC?" Yankee Group (Apr. 2012), attached as Exhibit N.

[71] Deposition of David Martin at 13:6-11, and 14:13-25.

[72] Id. at 15:7-11.

DECLARATION OF MARGARET A. DALEY

Administration ("NANP") following the very procedure described by Mr. Hansen. I also compared those results to the identification of the wireless carriers provided by LexisNexis for the same cellular telephone numbers. I conducted this analysis on a subset of 200 telephone numbers randomly selected from Plaintiff's Proposed Class. **Sixty percent** of the numbers are currently identified by LexisNexis as being administered by a *different* wireless carrier than the one listed in the Central Office Code Assignments data.[73]   I am not a statistician and I do not represent that these results are a statistically sound sample which can be applied directly to the overall universe of phone numbers at issue in this case. Additionally, as discussed below, the ability of data brokers such as LexisNexis to reliably identify the owner of a cellular telephone number is limited by numerous factors. These results are however probative and indicate that the rate at which consumers change wireless carriers is substantially higher than the "small percentage" Mr. Hansen claims.

*Plaintiff's Class Identification Methodology Results in the Improper Inclusion of Class Claimants Who Have No Claim Under the TCPA*

73.     Plaintiff also proposes to identify class claimants by conducting a reverse lookup in the database of a commercial data broker for the names and addresses associated with a list of phone numbers.[74]

74.     I have been in the private investigations business since 1997 and have conducted thousands of background checks in the last 18 years. I am very familiar with the data provided by data processors and am experienced in the use of cellular telephone reverse lookup services. I can state with a reasonable degree of certainty from my professional experience that cellular telephone reverse lookup services are not considered highly reliable in the investigations industry because they are not obtained from reliable public sources of information. In my experience these lookup services typically have a

---

[73] <u>See</u> Phone Carrier Analysis, Exhibit O.

[74] Plaintiff David Martin's Notice of Motion and Motion for Class Certification, p. 13-14.

DECLARATION OF MARGARET A. DALEY

50/50 chance of accurately identifying the *current subscriber* of a cellular telephone number. These database services are significantly less reliable in identifying *historical* owners.

75.   Identifying the ownership of a cellular telephone number is by its very nature difficult. Unlike landlines, no national directory of cellular telephone owners is published by any organization and cellular providers do not make the information readily available. Data brokers that provide reverse lookup services compile the information from a diverse and proprietary set of data sources such as lead lists from lead generation websites, the accuracy of which varies widely. LexisNexis does not even identify its sources of cellular telephone ownership data, by which to evaluate its reliability.[75]

76.   In contrast, other data provided by brokers like LexisNexis, such as real estate ownership and business records, are sourced from reliable public records, including recorded deeds and secretary of state records. The accuracy of *that* data is not, however, at issue here, and the reputation of LexisNexis and other data brokers in adequately aggregating this type of data should not be applied to their cellular telephone number lookup services, which are drawn from an entirely different and less reliable type of data. These reverse lookup services do not enjoy a reputation for accuracy in the investigations industry. In fact, these reports are viewed with significant skepticism by professional investigators. The identifications provided by them are considered a potential *lead* to and not the definitive answer to the identity of a telephone owner.

77.   A number of factors make it extremely difficult, if not impossible, to obtain identification of putative class members in the same position as Mr. Martin --the people that actually received Notification Calls. These factors include:

- Data brokers cannot identify the actual user of a cellular phone number at a particular point in time. Identified owners of cellular phone plans may be the spouses, parents, sibling or friend of the person who actually

---

[75] Email from Leslie Sherman at LexisNexis.com, April 14, 2016, attached as Exhibit P.

DECLARATION OF MARGARET A. DALEY

received the Notification Call.

- According to a 2015 FCC report, there is an average monthly "churn" rate of 1.44-1.85%.[76] This means, on average, a cellular telephone number will change hands within 6-7 years. It is therefore likely that a substantial number of the phone numbers at issue in this case changed hands during the time period covered by the class definition. Data brokers' historical records are unreliable at best and often non-existent as to if and when a number changes hands.[77]

- Persons that are unable to afford to or chose not to own their own phone may use the cellular telephones of friends and family members.

78. AT&T, one of the largest wireless carriers with a current subscriber base of over 130 million,[78] reported in 2013 that "[a]bout 90% of our postpaid smartphone subscribers are on FamilyTalk® plans (family plans), Mobile Share plans or business plans,"[79] whereby the actual end *users* of a phone number are different from the *subscriber*. According to AT&T, another 7% of their wireless subscribers are on a prepaid plan,[80] including so-called "burner phones" for which the wireless carrier maintains *no* documentation of the user's identity.[81]  All told, the vast majority of the subscriber base,

---

[76] See the 18th Mobile Wireless Competition Report, published by the Federal Communications Commission, accessed at https://www.fcc.gov/document/18th-mobile-wireless-competition-report.

[77] In the case of Sherman v. Yahoo, the court denied class certification in a matter involving a similar proposal to use a cellular telephone reverse number lookup process to identify class claimants.  In the order denying class certification, Judge Gonzalo Curiel agreed with defendant Yahoo's argument that "reverse lookup systems are fraught with difficulties and are unlikely to provide accurate contact information two years later."  Sherman v. Yahoo, 3:13cv00041 (S.D. Calif., filed Jan. 8, 2013), ECF No. 191.

[78] Q1 2016 AT&T Earnings – Investor Briefing, p. 13 accessed at https://www.att.com/Investor/Earnings/1q16/ib_final_1q16.pdf.

[79] AT&T Inc. 2013 Annual Report, p. 17, accessed at https://www.att.com/Investor/ATT_Annual/2013/downloads/ar2013_annual_report.pdf.

[80] Id.

[81] The anonymous nature of prepaid plans have been questioned by legislators concerned about their use by terrorists and other criminals. California is currently considering a proposed bill, dubbed the "Closing the Pre-Paid Mobile Device Security Gap Act of 2016," or HR 4886, which will require retailers to ask

---

32

for one of the leading wireless carriers, consist of accounts for which the provider may not have any reliable record of the user's identity at all. While comprehensive information about the cellular telephone market is not readily available, a study by PriceWaterhouseCooper regarding the cellular market timeframe at issue in this case, reported that family plans account for 40% of the overall cellular market and that prepaid plans account for another approximately 30%.[82]

79.    As shown by the T-Mobile bills produced by Mr. Martin (and attached to this declaration as Exhibit E, Mr. Martin may have been the user of his telephone number, but he was not the subscriber of record according to his wireless carrier.  Instead his wireless carrier identified Alexandria Ciolac as the name associated with the number (510) 332-3943.

80.    Plaintiff's proposed methodology takes *none* of these complexities into account. The Motion for Class Certification merely suggests with offhand casualness that identifying the owners of the cellular telephone numbers found in the call logs is a simple, straightforward, and reliable task. Apparently, if plaintiff's counsel finds *any* name associated with a cellular telephone number in the database of their chosen data vendor, they will declare them a class member, and presumably seek damages on their behalf, ***despite having no proof that they ever received a single Notification Call.***

81.    Many data brokers do not even offer historical cellular phone number ownership records. For example, Experian, a leading international data broker, recently reported to BRG that Experian does not maintain or sell historical data on cellular telephone numbers ownership:

---

prepaid device buyers for their proper identification. *See* http://thehackernews.com/2016/03/prepaidp-burner-phone.html.

[82] <u>See</u> Exhibit G, p. 55 and 65 (percentage of family plans calculated as 58% of the postpaid market, identified itself as being 70% of the market).

DECLARATION OF MARGARET A. DALEY

**We don't have any historical ownership data on the phones so we would not be able to accommodate [this] request for historical assignments.** (Emphasis added)[83]

In addition, Nexxa, another prominent database vendor, also denies that it can provide historical cellular telephone ownership identification. When contacted, a Nexxa representative responded that "*we currently do not have access to the historical cell phone owner data*. That data resides directly with the carriers." (Emphasis added).[84]

Data brokers who sell cellular telephone data warn their customers that the information is not reliable. LexisNexis for example provides the following disclaimer with respect to telephone lookup services:

> Important: The Public Records and commercially available data sources used on reports have errors. Data is sometimes entered poorly, processed incorrectly and is generally not free from defect. This system should not be relied upon as definitively accurate. Before relying on any data this system supplies, it should be independently verified.[85]

82.     I know from personal experience on prior casework that LexisNexis does not expect any better than a 60-70% "hit rate" of finding *any* name and address to associate with a given cellular telephone number.

83.     The unreliable nature of LexisNexis' cellular telephone reverse lookup service is demonstrated by other misidentifications. For example, LexisNexis Cellular Phone Number Plus lookup service identifies *only* the name "William Wartson" for a cellular telephone number that I used as a professional wireless contact number during the

---

[83] Email from Josh Eidell at Experian Data Quality, May 3, 2016, attached as Exhibit Q.

[84] Email from Holly Paulus at Nexxa Group, May 4, 2016, which is attached as Exhibit R.

[85] LexisNexis End User Agreement, attached as Exhibit S.  In addition, LexisNexis' license agreement further warns the user regarding the accuracy of the data:

> **"Section 3 - Not Legal Advice:** Content is not intended to and does not constitute legal advice and no attorney-client relationship is formed, nor is anything submitted to this Web Site treated as confidential. The accuracy, completeness, adequacy or currency of the Content is not warranted or guaranteed. Your use of Content on this Web Site or materials linked from this Web Site is at your own risk."

34

DECLARATION OF MARGARET A. DALEY

time frame at issue in this dispute. The number was owned by my prior employer Duff & Phelps and my use of the number ended in April 2015.[86]  The failure of LexisNexis to correctly identify this number with my name is indicative of the fundamental problem with using these unreliable cellular number lookup services to identify *historical users* of any given phone number.

84.    I recently conducted my own reliability testing of LexisNexis' reverse lookup service, using a list of 167 cellular telephone numbers for which I already knew the correct current *user*'s name. These numbers encompassed a range of phone service types including individually owned single user plans, family plans, and employer-owned plans.[87]

85.    Only 68 of these test numbers returned the correct name of the user, representing an accuracy rate of only 41%.[88]  This result is consistent, although somewhat lower, than my professional experience which indicates that these reverse lookup services have a 50/50 accuracy rate in identifying current owners.

### PLAINTIFF'S EXPERT JEFFERY HANSEN HAS OVERSTATED AND MISREPRESENTED HIS PROFESSIONAL EXPERIENCE AND TECHNICAL CREDENTIALS

86.    I have been an opposing testifying or consulting expert in three matters involving Mr. Hansen. I have been physically present in two of his depositions and I personally undertook a comprehensive background investigation into the professional experience and credentials Mr. Hansen claims in his expert reports and on his *curriculum vitae*. Based upon the facts unearthed in my investigation, it is my opinion as a professional investigator and certified fraud examiner that Mr. Hansen has exaggerated his credentials and presents misleading statements regarding his professional qualifications.

87.    In both his Declaration and *curriculum vitae*, Mr. Hansen claims a set of

---

[86] Exhibit T, LexisNexis Report.

[87] I do not know if any pre-paid plans were included in the data set, but I did not take any steps to exclude them, and assume that pre-paid plans were included in some percentage.

[88] Exhibit U, cellular phone number reverse lookup test results.

DECLARATION OF MARGARET A. DALEY

credentials, qualifications, and experience that purportedly establish his ability to offer expert opinions in matters relating to automatic dialer systems and in TCPA matters in general.  Specifically, he claims to:

1)  frequently "act as a consultant to companies that engage in the use of autodialers" and that he has set up and maintained "all aspects of predictive dialers and autodialers;"[89]

2)  have taught "1000 students" to be computer engineers;[90]

3)  be a seasoned expert witness who has served in "more than 150 TCPA class action lawsuits;"[91]

4)  have worked at the FBI Regional Computer Forensic Laboratory;[92]

5)  have multiple technical certifications, including the MSCE.[93]

88.    As detailed below, these claims appear to be exaggerated and misleading. Furthermore, what experience he does have was gained through associations with convicted felons and fraudsters and companies that have apparently exploited the very consumers plaintiff purports to represent.

89.    Mr. Hansen has never been employed at a call center, telecommunications carrier, hardware or software company.[94]  He never attended college.[95]  He has not taken a

---

[89] Hansen's Report, p. 3:9-11.

[90] Id., p. 4:6-8.

[91] Id., p. 2:18-20.

[92] Id., p. 4:9-13.

[93] Id., p. 4:1-2.

[94] Deposition of Jeffrey Hansen at 89:4-94:18.

[95] Id. at 19:19-25 and 21:21-25.

DECLARATION OF MARGARET A. DALEY

continuing education course in over ten years.[96]  He has never authored any publications. He has never belonged to any industry trade groups. He does no public speaking on any related technology subjects. He has received no industry awards or recognition. His full time job for the last ten years is to run fiber optic cable to naval ships and is unrelated to automatic dialer systems.[97]  His "expert" work is performed in his off hours out of his home or in a van during downtime at his full time job.[98]  His only professional credentials, outside of his prolific expert witness work on behalf of plaintiff's class action counsel, is limited to working for a for-profit computer training school which was shut down by the state of California for defrauding students[99] and a robocalling company run by a convicted felon which has been sued on multiple occasions for violating the TCPA.[100]

*Mr. Hansen's Experience Setting Up Predictive Dialers and Autodialers*

90.    In his Report, Mr. Hansen claims that he "*frequently* act[s] as a consultant to *companies* that engage in the use of autodialers."[101] (Emphasis added)  Despite his use of the plural form in this sentence, he admitted when pressed that he has only been an outside consultant for one call center, HomeyTel, Inc.[102]

91.    HomeyTel is the sole proprietorship of one Conrad Braun.[103]  Conrad Braun is a repeatedly incarcerated felon with a colorful history of violence, threats, and fraud. Mr. Hansen first met Mr. Braun in 2000[104] when Mr. Braun was released from prison for his

---

[96] Id. at 33:5-13.

[97] Id. at 93:20-94:23.

[98] Id. at 165:3-5 and 95:1 - 96:-16.

[99] http://www.10news.com/news/laptop-training-school-closes-with-no-warning, Attached as Exhibit V.

[100] Deposition of Jeffrey Hansen at 104:21-120:20, and 126:3-10.

[101] Hansen's Report p. 3.

[102] Deposition of Jeffrey Hansen at 104:21-24; 105:8-20; and 120:16-20.

[103] See California Secretary of State Business Entity Record for HomeyTel, attached as Exhibit W.

[104] Deposition of Jeffrey Hansen at 106:16-20.

DECLARATION OF MARGARET A. DALEY

1994 convictions on five counts of wire fraud, and five counts of interstate transfer of monies taken by fraud.[105]  Mr. Braun was re-arrested within three months for violations of that supervised release, and was returned to prison.

92.   Mr. Hansen testified that he set-up, configured, and maintained the dialers used by Conrad Braun and HomeyTel, and that this constitutes the *entirety* of his professional experience with call centers:

> Q    But for which companies did you physically set up the call center?
>
> A    It would be HomeyTel's.
>
> Q    That's the only one?
>
> A    Yes.[106]

Although Mr. Hansen characterizes his work for Conrad Braun and HomeyTel as "extensive,"[107] he also admitted he provided most of his services for free:

> A    A lot of the work that I did for them I didn't charge them for. The idea was if he could become more profitable, then we'll talk about it then. But he wasn't making enough of a profit margin to really afford payroll.
>
> Q    You didn't want to bill him because you wanted his business to be able to grow?
>
> A    I wanted his business to be able to grow.
>
> Q    So you could do more work for him?
>
> A    That was the -- well, that was the idea, yes.[108]

93.   Mr. Hansen testified that he compiled the lists of telephone numbers that Mr.

---

[105] U.S.v. Braun, Defendant-Appellant, No.  94-3847, Decided: July 13, 1995, accessed at http://caselaw.findlaw.com/us-8th-circuit/1301714.html, Attached as Exhibit X; and Order for Issuance of Warrant for Arrest, Re. Braun, No. 93-00133-01-CR-W-9-5 (W.D. Mo. filed Sept. 8, 1993), Attached as Exhibit Y.

[106] Deposition of Jeffrey Hansen at 120:16-20.

[107] Id. at 115:23-25.

[108] Id. at 116:15-25

DECLARATION OF MARGARET A. DALEY

Braun used for a particularly notorious 2006 calling campaign.[109]  Mr. Braun, recently released from prison relating to a blackmail conviction,[110] initiated a voice-broadcast robocall campaign to hundreds of thousands of Kansas citizens using a pre-recorded message that personally attacked Kansas Attorney General-elect Paul Morrison, who Mr. Braun believed was responsible for his blackmail conviction.[111]  This calling campaign resulted in numerous TCPA complaints and widespread media coverage.[112]

94.    A TV news story about the Paul Morrison robocalls featured video footage of HomeyTel's call center, which, as described and shown in the footage, consists of a "small office jammed with exposed telephone wires, high power modems, and a bank of computers using 60 telephone lines."[113]  Images of the call center from the TV news report are below:

---

[109] Deposition of Jeffrey Hansen at 125:8-126:2.

[110] State of Kansas, Appellee, v. Conrad Braun, Appellant, No. 103,560, Ct. App. Kan., accessed at https://www.courtlistener.com/opinion/2332718/statevbraun/, Attached as Exhibit Z.

[111] "Californian behind calls against Morrison," LJ World.com (Jan. 3, 2007) accessed at http://www2.ljworld.com/news/2007/jan/03/campaign_continues/, Attached as Exhibit AA.

[112] http://www.dslreports.com/forum/r22155357-scumbag-robo-calling-spammer-Conrad-J-Braun; http://800notes.com/Phone.aspx/1-619-325-1752; http://whocallsme.com/phone-number.aspx/8882127106; https://whocalled.us/lookup/HomeyTel; and http://www.everycaller.com/caller/HomeyTel, attached as Exhibit BB.

[113] https://www.youtube.com/watch?v=U8xeWipGm64, Attached as Exhibit CC.

DECLARATION OF MARGARET A. DALEY

 

 

95.    When Mr. Hansen claims in his expert report that he has "set up and maintained all aspects of predictive dialers and autodialers from predictive dialers operating with just three telephone lines to outbound call centers capable of generating over 1 million calls per hour,"[114] what he is referring to is the equipment underneath the desk in the pictures above.[115]

96.    The second HomeyTel calling campaign known to involve Mr. Hansen involved a series of robocalls made in 2010 that resulted in lawsuits alleging that the calls

---

[114] Hansen's Report p. 3.

[115] In a sworn affidavit in a TCPA action filed against HomeyTel and Mr. Braun, plaintiff's counsel in that matter described the HomeyTel offices: "The office is in one corner of an old dilapidated building, and from what I could observe of the partition with the office next door (which was occupied with lights on inside), the HomeyTel "office" could scarcely be larger than 10 feet by 15 feet, or the size of one single desk office space. Sapan v. Homeytel, Inc., Conrad Braun, *et al*., Case No. 30-2011-0087692 (San Diego Cnty. Sup. Ct., March 15, 2011), Declaration of Attorney Christopher J. Reichman in Support of Default Judgment, p. 3 ¶¶ 9-10, attached as Exhibit DD.

DECLARATION OF MARGARET A. DALEY

were part of a fraudulent scheme to peddle debt relief, insurance, and other financial products to consumers. Pleadings in that lawsuit, <u>Sapan v. HomeyTel, Conrad Braun, et al.</u>, state that the calls followed nearly identical scripts to sell various financial products such as insurance and credit card debt relief. For example one call featured a female voice saying "Hello this is Andrea with HomeyTel business news" and then referencing a fictitious "bank stress test act" before selling debt relief services. Another call from "David" stated it was from "TaxReliefNews" and used the same script. The pleadings also alleged that the calls placed by HomeyTel falsified the caller ID number presented to the call recipients. The number identified as the caller ID of the call's origin was not a working number.[116]

97.    Inspection of the web page cited in the call's message, TaxReliefNews.com, revealed that the page had been commissioned by HomeyTel and was hosted on the domain http://pam.thethugz.com/HomeyTel/ taxreliefnews.[117]    Online records indicate that Mr. Hansen is the registrar of the "Thugz.com" domain.[118]

98.    Robocalling campaigns on behalf of credit card debt and bank loan reduction services have a checkered history. There are so many documented cases of companies offering these services defrauding impoverished people that the FTC has a page on its website devoted to warning consumers away from these services. In fact the FTC advises consumers to ***never*** respond to these solicitations:

> The Federal Trade Commission (FTC), the nation's consumer protection agency, says consumers who get these interest rate reduction robocalls should listen to them with extreme skepticism, and delete them. Many are scams.[119]

---

[116] <u>See</u> Exhibit DD.

[117] <u>Id.</u> at 10.

[118] http://www.salespider.com/b-359389576/thugz-network-solutions and http://homeownerscircle.com/company-359389576/thugz-network-solutions

[119] https://www.consumer.ftc.gov/articles/0131-credit-card-interest-rate-reduction-scams

DECLARATION OF MARGARET A. DALEY

*Mr. Hansen's Experience Teaching a 1000 Students to be Computer Engineers*

99.     Mr. Hansen was employed from 2000 to 2004 by Laptop Training Solutions ("LTS") as "Director of Training."  LTS' license to operate was revoked by the California Bureau for Private Postsecondary and Vocational Education due to audit failures. A consumer class action fraud case was filed against LTS in 2003.[120]  In September 2004, LTS closed, and filed for Chapter 7 Bankruptcy on October 1, 2004. The company's filing lists over $5.2 million in liabilities. Many of these creditors appear to be the school's students.[121]

100.     Mr. Hansen's *curriculum vitae* states that while at LTS he provided "long distance support via telephone to hundreds of MCSE students throughout the country."[122] Mr. Hansen however ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████[123]

101.     █████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████. In a press release cited by the Consumer Law Center, Mr. Campion stated as follows:

> Doug Campion, the attorney handling Henley's class action suit against
>
> LTS, called the case "***one of the most egregious frauds I've ever seen***."

---

[120] Russell, *et al.*, v. DAT, Inc. dba Laptop Training Solutions, GIC804272 (San Diego Sup. Ct., filed Jan. 23, 2003)

[121] See Laptop Training Solutions Bankruptcy Petition, U.S. Bankruptcy Court S. D. Calif. Case no. 04-08579-7, attached as Exhibit EE.

[122] Jeffrey Hansen's CV, included as Exhibit A to Hansen's Report, p. 3.

[123] Deposition of Jeffrey Hansen at 71:3-5 and 72:12-15.

DECLARATION OF MARGARET A. DALEY

According to Campion, *a former LTS trainer revealed that of the 800-1,000 students enrolled in LTS, only 12 students ever passed the Microsoft Certification exam* for which the course was meant to train students. (Emphasis added)[124]

102.   When asked at his deposition, Mr. Hansen testified as follows:

█ ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

█ ██████████████████.[125]

103.   Mr. Campion is, surprisingly, responsible for giving Mr. Hansen his start as an "expert" witness. [126]

*Mr. Hansen's Experience as an "Expert" Witness in "More Than 150 TCPA Class Action Lawsuits"*

104.   In his report, Mr. Hansen claims that he has "served as an expert or consultant in more than 150 TCPA class action lawsuits."[127]   He testified he may have worked in as many as 100 of them just in the last two years.[128]   According to his deposition testimony, between his full time job connecting cable and his "expert" witness casework he now works 18 to 20 hours a day (140 hours a week).[129] He also testified he typically works 60-70 hours per week as an expert on TCPA matters, in addition to his 40-hour-per-week full time employment running cable to navy ships. [130]

105.   Forensic analysis is a complex undertaking. This is particularly true in TCPA

---

[124] <u>See</u> National Consumer Law Center Report (June 2005), attached as Exhibit FF, p. 5.

[125] Deposition of Jeffrey Hansen at 73:13-17.

[126] <u>Id.</u> at 170:6-15.

[127] Hansen's Report, p.2.

[128] Deposition of Jeffrey Hansen at 168:18-169:3.

[129] <u>Id.</u> at 97:3-14.

[130] <u>Id.</u> at 96:7-16.

DECLARATION OF MARGARET A. DALEY

matters which typically involve the analysis of complex data warehouse systems which use relational databases that store tens of millions of individual call records. Understanding the system's design, unique configuration, operational history and audit history is critical to accurately assessing the nature of the system itself and thus the validity of the data contained within it. Reliable analytical results come from careful attention to detail.

106.   Mr. Hansen testified he works alone at his expert consulting business, and that his data analysis is not reviewed or quality checked by any other person.[131]

107.   If Hansen has indeed worked on 100 TCPA cases in the last two years this would constitute an extraordinary level of expert witness work, particularly for a solo practitioner with an unrelated full time job. If the number of cases presented on his expert report are presumed to be true there are red flags that Hansen may be running an expert report "mill."  These red flags are:

1) The extraordinarily high volume of cases and expert reports produced by Hansen in his off hours;

2) The suspiciously high  number of hours he claims to be working each week on  regular basis;

3) The exaggerated credentials he claims on his expert reports and curriculum vitae; and

---

[131] Id. at 169:18-23.

4)  His publicly articulated bias against defendants in TCPA Matters.[132]

> *Mr. Hansen's Experience at the FBI Regional Computer Forensic Laboratory*

108.   Mr. Hansen's expert report claims that he has handled "many computer forensic and eDiscovery matters" while "working at the FBI sponsored Regional Computer Forensic ("RCFL").[133]   The RCFL is a training and support center for law enforcement agencies. RCFL Examiners are drawn from federal, state, and local law enforcement agencies and they are responsible for seizing and collecting digital evidence at a crime scene, conducting an impartial examination of submitted computer evidence and testifying as required.[134]

109.   Mr. Hansen was never employed by the FBI and he has never been employed by any law enforcement agency as a forensic technologist. When asked about this at his

---

[132] For example, Hansen uses his public Facebook page to advertise his expert witness work.  It contains the following post from July 14, 2016 in which he writes "I don't always drink beer, but when I do, it's after dealing with defense attorneys."



[133] Hansen's Report, p. 4.

[134] *See* https://www.rcfl.gov/about

DECLARATION OF MARGARET A. DALEY

deposition, Mr. Hansen admitted he was only a "volunteer."[135]  He claims to have "installed and configured systems for mobile laboratory" and also states that he handled evidence in some capacity, although he declined to offer specifics.[136]  Mr. Hansen also testified that he volunteered at the RCFL for between seven to nine months.[137]

110.   Mr. Hansen testified that during this extended period of volunteer service, he was supervised by Jeff Cable, the then-assistant director of the RFCL.[138]  One of BRG's investigators contacted Jeffrey H. Cable by telephone on July 25, 2016. Mr. Cable confirmed that he was a retired San Diego Police Officer and he previously worked at the San Diego RCFL. He did not recall ever working with an individual named Jeff Hansen. He also stated that he did not recall the RCFL ever using volunteers in any capacity.[139]

111.   In his deposition Mr. Hansen also attempted to identify an additional RCFL contact who supervised him, but struggled to remember the person's name. Mr. Hansen offered the names "Randy Bolell," and "Randy Bolelli."[140]  Researchers working at my direction have attempted to identify and locate this individual, but no person matching this description has been identified.

*Mr. Hansen's Technical Certifications*

112.   All of Mr. Hansen's technical certifications listed in his CV were obtained between 2000 and 2006. These certifications are variously expired, retired, irrelevant, and/or non-existent. With few exceptions, they represent entry-level credentials for experience with now-obsolete technologies. A summary of these certifications is set forth in Exhibit HH.

---

[135] Deposition of Jeffrey Hansen at 97:23-98:3.

[136] Id. at 101:12-103:3.

[137] Id. at 102:1-3.

[138] Id. At 245:21-246:20 and 254:23-25.

[139] See Affidavit of Mark Skertic, attached as Exhibit GG.

[140] Deposition of Jeffrey Hansen at 98:15-19, and 245:22-246:1.

DECLARATION OF MARGARET A. DALEY

113.   To the extent any of these certifications are still technically valid, despite his failure to conduct any of the continuing education expected by the credentialing organizations, it is because he obtained them *so long ago* that the requirements for continuing education were not yet in place.[141]  Mr. Hansen's *curriculum vitae* makes it clear he has not taken a single formal continuing education course since 2006, *ten years ago*. Continuing education is particularly important in technology-related professions as software programs and computer hardware change rapidly, making prior expertise quickly out of date. To give concrete examples, the last time Mr. Hansen took *any* professional education or training, Twitter had just launched, the first smartphone (the iPhone) was a year away from being introduced and Facebook was still limited to students.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 3, 2016 at Chicago, Illinois.

Margaret A. Daley

---

[141] https://certification.comptia.org/continuing-education/comptia-continuing-education-program-faq#certrenewalprocess1; also see: https://certification.comptia.org/continuing-education/how-to-renew/ce-renewal-cycle, and https://www.microsoft.com/en-us/learning/retired-certifications.aspx.

DECLARATION OF MARGARET A. DALEY

List of Exhibits

| | |
|---|---|
| A | Curriculum Vitae of Margaret Daley |
| B | List of Documents Relied Upon |
| C | Nicholas H. Weil, "Dialing While Incarcerated: Calling For Uniformity Among Prison Telephone Regulations," Washington University Journal of Law and Policy (2005) |
| D | GfK MRI's Survey of the American Consumer Press Release, "44% of US Adults Live in Households with Cell Phones But No Landlines" (Feb. 4, 2015) |
| E | T-Mobile billing records |
| F | BRG's Analysis of Proposed Class List Volume Dispersion |
| G | 2012 North American Wireless Survey |
| H | Pew Research Center's April 1, 2015 report on U.S. Smartphone Use |
| I | Call Record Extract |
| J | FCC Report Dec. 18 2014 |
| K | Declaration of Timothy Sostrin and Exhibits |
| L | Johnson v. Yahoo! Inc., 1:14cv02028 (N.D. Ill., filed Mar. 21, 2014), ECF 115 and 116 |
| M | Wireless carriers' subpoena policies |
| N | Yankee Group - NPAC whitepaper_April 2012 |
| O | Phone Carrier Analysis |
| P | Email from Leslie Sherman at LexisNexis.com, April 14, 2016 |
| Q | Email from Josh Eidell at Experian Data Quality, May 3, 2016 |
| R | Email from Holly Paulus at Nexxa Group, May 4, 2016 |
| S | LexisNexis End User Agreement |
| T | Lexis Nexis report for Wartson |
| U | Cellular Phone Number Reverse Lookup Test Results |
| V | Laptop Training School Closes With No Warning |
| W | California Secretary of State Business Entity Record for HomeyTel |
| X | UNITED STATES of America, Plaintiff-Appellee, v. Conrad Jules BRAUN, Defendant-Appellant, No. 94-3847 |
| Y | Order for Issuance of Warrant for Arrest, Re. Braun, No. 93-00133-01-CR-W-9-5 |

DECLARATION OF MARGARET A. DALEY

| Z | State of Kansas, Appellee, v. Conrad Braun, Appellant, No. 103,560 |
| AA | "Californian behind calls against Morrison," LJ World.com (Jan. 3, 2007) |
| BB | Online consumer complaints |
| CC | News Report on HomeyTel (submitted as native video file) |
| DD | Sapan v. HomeyTel, Inc., Conrad Braun, et al., Case No. 30-2011-0087692 (San Diego Cnty. Sup. Ct., March 15, 2011), Declaration of Attorney Christopher J. Reichman in Support of Default Judgment |
| EE | <u>Laptop Training Solutions Bankruptcy Petition</u>, U.S. Bankruptcy Court S. D. Calif. Case no. 04-08579-7 |
| FF | "Making the Numbers Count," National Consumer Law Center (June 2005) |
| GG | Affidavit of Mark Skertic |
| HH | Chart of Certifications |

DECLARATION OF MARGARET A. DALEY